## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

WW, LLC                              *
t/a THE COFFEE BEANERY CAFÉ
A Maryland Limited Liability Corporation    *
1007 Dulaney Lane

                                          *
Annapolis, Maryland 21403
                                          *
and
                                          *
DEBORAH WILLIAMS
1007 Dulaney Lane                             *
Annapolis, Maryland 21403
                                          *
and
                                          *
RICHARD WELSHANS
1007 Dulaney Lane                             *      Civil No. 05-cv-3360 WMN
Annapolis, Maryland 21403
                                          *
       Plaintiffs,
                                          *
v.
                                          *      Jury Trial Requested
THE COFFEE BEANERY LTD
3429 Pierson Place                             *
Flushing, Michigan 48433
                                          *
Resident Agent:
Corporation Trust Incorporated            *
300 East Lombard Street
Baltimore, Maryland 21202               *
and                                         *
JOANNE SHAW                          *
President of The Coffee Beanery Ltd
3429 Pierson Place                             *
Flushing, Michigan 48433
                                          *
and
                                          *

JULIUS L. SHAW                                    *
Chairman of The Coffee Beanery Ltd
3429 Pierson Place                               *
Flushing, Michigan 48433
                                                 *
and
                                                 *
KEVIN SHAW
Vice President of Development                    *
The Coffee Beanery Ltd
3429 Pierson Place                               *
Flushing, Michigan 48433
                                                 *
and
                                                 *
KURT SHAW
Vice President of New Business Development       *
The Coffee Beanery Ltd
3429 Pierson Place                               *
Flushing, Michigan 48433
                                                 *
and
                                                 *
KEN COXEN
Executive Vice President of                      *
The Coffee Beanery Ltd
4626 White Oak Ct, Apt 10
Clarkston, MI 48348-3568
                                                 *
and
                                                 *
OWEN STERN
Chief Operations Officer of                      *
The Coffee Beanery Ltd
6226 Mission Dr
W Bloomfield, MI 48324-1393

and                                              *

WALTER PILON                                     *
Vice President of Brand Building of              *
The Coffee Beanery Ltd
20036 Briarcliff Rd
Detroit, MI 48221-1321

      Defendants.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## SECOND AMENDED COMPLAINT

Plaintiffs, WW, LLC t/a The Coffee Beanery Café ("WW"), Deborah Williams ("Williams") and Richard Welshans ("Welshans"), (jointly "Plaintiffs"), by their attorneys, Harry M. Rifkin and Law Offices of Harry M. Rifkin LLC, sue Defendants, The Coffee Beanery Ltd. ("CBL"), JoAnne Shaw, Julius L. Shaw, Kevin Shaw, Kurt Shaw, (jointly "the Shaws"), Ken Coxen ("Coxen"), Walter Pilon and Owen Stern ("Stern"), (jointly "Defendants"), for violations of the Maryland Franchise Act, breach of contract, fraud and negligent misrepresentation, and the Racketeer Influenced and Corrupt Organizations ("RICO") Act and declare and allege as follows:

## PARTIES

1.　　WW is a Maryland limited liability company formerly with its principal place of business located at Annapolis Technology Park, 2641 Riva Road, Suite F, Annapolis, Maryland 21401.  WW formerly operated The Coffee Beanery Café at that location.  It is now closed and not operational.

2.　　Williams is a citizen of the state of Maryland residing in Anne Arundel County and is a member of WW.

3.　　Welshans is a citizen of the state of Maryland residing in Anne Arundel County and is a member of WW.

4.　　CBL is a Michigan corporation with its principal place of business at 3429 Pierson Place, Flushing, Michigan 48433.

5.　　JoAnne Shaw is a citizen of the state of Michigan and is the President of CBL.  JoAnne Shaw is the wife of Julius Shaw and the mother of Kevin and Kurt Shaw.

6.      Julius Shaw is a citizen of the state of Michigan and is the Chairman of CBL.  Julius Shaw is the husband of JoAnne Shaw and the father of Kevin and Kurt Shaw.

7.      Kevin Shaw is a citizen of the state of Michigan and is the Vice President of Development of CBL.  Kevin Shaw is the son of Julius and JoAnne Shaw and the brother of Kurt Shaw.

8.      Kurt Shaw is a citizen of the state of Michigan and is the Vice President of New Business Development of CBL.  Kurt Shaw is the son of Julius and JoAnne Shaw and the brother of Kevin Shaw.

9.      Ken Coxen ("Coxen") was, at all relevant times, a citizen of the state of Michigan and the Executive Vice President of CBL.

10.     Owen Stern ("Stern") was, at all relevant times,  a citizen of the state of Michigan and the Chief Operations Officer of Defendant CBL.

11.     Walter Pilon ("Pilon") was, at all relevant times, a citizen of the state of Michigan and the Vice President of Brand Building of Defendant CBL.

**JURISDICTION**

12.     CBL transacts business in the state of Maryland and numerous other states by *inter alia* franchising Coffee Beanery locations and selling goods and services to franchised locations including locations in Maryland.

13.     Defendants are subject to jurisdiction of this Court pursuant to the Maryland Franchise Act, Md. Bus. Reg. Code Ann. § 14-201 *et seq.*

14.     CBL has consented to service of process having the Securities Commission as the franchisor's agent to receive process in Maryland.

15.      CBL has consented to be sued in Maryland pursuant to the Maryland Franchise Act, Md. Bus. Reg. Code Ann. § 14-216(c)(25).

16.      This Court has jurisdiction over this matter by reason of diversity of citizenship, 28 USC § 1332, in that WW is a Maryland limited liability corporation, Williams and Welshans are Maryland citizens, CBL is a Michigan corporation with its principal place of business in Michigan and the individual Defendants are citizens of the state of Michigan and the matter in controversy exceeds $75,000 exclusive of interest and costs.

17.      This Court has Federal question jurisdiction as the claims being asserted are predicated on The Racketeer Influenced and Corrupt Organizations Act (hereinafter referred to as "RICO"), 18 U.S.C. § 1961–1968, the predicate acts of 18 U.S.C. 1961-1968, and 28 U.S.C. § 1331.

18.      Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 as a substantial amount of the events which form the basis of the Defendants' liability occurred in the District of Maryland.

19.      This Court may additionally exercise supplemental jurisdiction over all of the state law claims asserted herein pursuant to 28 U.S.C § 1367.

## **BACKGROUND**

20.      Sometime on or before May 28, 2003, Williams and Welshans applied for a franchise to operate a Coffee Beanery Café in Annapolis, Maryland.    Traditional Coffee Beanery stores are located in malls, airports and other high traffic areas and generally serve only coffee and limited baked goods.  Café stores are purportedly located

in neighborhood settings and offer a food menu (such as sandwiches and wraps) in addition to coffee.

21.     On or about June 3, 2003, CBL over-nighted to Welshans and Williams a copy of a Uniform Franchise Offering Circular ("UFOC") that CBL falsely represented was registered with the Maryland Attorney General's Office as of January 24, 2003.  The UFOC received by Welshans and Williams was not the same UFOC on file with the Attorney General's Office.

**CBL's Fraudulent UFOC Statements and Omissions to Welshans and Williams**

22.     CBL sent the UFOC from Michigan to Maryland. On that same day, CBL faxed a copy of the Acknowledgment of Receipt of UFOC page from Michigan to Welshans and Williams in Maryland for execution and return by facsimile, which Welshans and Williams executed.  The UFOC sent by CFL to the Wilshans and Williams contains the following false representations, among others:

   a.  "we are in the business of: operating specialty retail stores, cafes [i.e.,
       Coffee Beanery Cafés], kiosks, coffee/espresso carts, and coffee bars.  For
       ease of reference, all of these will be referred to in this Offering Circular
       as 'Stores' unless otherwise noted.  Our Stores sell fresh-brewed coffee,
       coffee beans, tea, spices, related products such as mugs and coffee makers,
       and food items.  We are also in the business of granting franchises for our
       Stores and have offered franchises since 1985."

   b.  "Since 1976, we have operated Stores of the type being franchised and
       continue to do so.  These Stores are located in regional shopping malls,
       airports, strip centers, office buildings and cafés."

c.  The total estimated initial investment for a Coffee Beanery Café store, including operating funds for the first three months, but excluding marketing fees and royalty fees is $327,000 - $449,000.

d.  These estimates are based on CBL's "twenty (20) years of experience in the coffee business."

e.  The UFOC contains a copy of the November 30, 2002 unaudited financial statement.

f.  "We maintain all sums paid to the [Marketing] Fund in an account separate from our other monies, and we will not use the advertising contribution to defray any of our expenses, except for reasonable costs and overhead, if any, we may incur in activities reasonably related to the administration of the Fund, including, costs of personnel and/or agency for creating and implementing advertising, promotional, and marketing programs."

g.  That CBL is making no earnings claims.

h.  That many CBL franchises identified as open are in fact closed at the time of the UFOC's publication.

23.  The UFOC also fraudulently omits the following material facts:

a.  CBL has not offered Coffee Beanery Cafés since 1985.  Coffee Beanry Cafes have been offered only since 1997.

b.  The Coffee Beanery Café is a new concept developed in 1997, which had not been and never was successful.

c.  CBL has no reasonable basis to estimate or opine that a franchisee's total estimated initial investment for a Coffee Beanery Café store, including operating funds for the first three months, but excluding marketing fees and royalty fees will be $327,000 - $449,000; CBL fails to disclose an average initial investment based on actual history of initial investments by franchisees, actual initial investments substantially exceeded $490,000. CBL estimate or opinion was not honestly entertained.

d.  A copy of the November 30, 2002 unaudited financial statement.

e.  There is no separate marketing fund.

f.  With regard to the 2% weekly gross sales paid by the franchisees to the marketing fund, CBL has no intention to apply the use the fees in the fund for the purposes set forth in the UFOC, i.e., "all costs of maintaining, administering, directing, conducting, and preparing advertising, marketing, public relations and/or promotional programs and materials, and *any other activities in which we believe will benefit the System*, including, the cost of preparing and conducting advertising campaigns in various media; preparing direct mail advertising; market research; and advertising and/or public relations agencies to assist in our advertising efforts; purchasing promotional items; conducting and administering Store promotions; providing promotional and other marketing materials and services to the businesses operating under the System, and point-of-purchase materials."

g. CBL requires cafes to have at least 24 employees on the payroll prior to being allowed to open.

h. Twenty-four employees are excessive and needlessly add to the overhead costs imposed upon franchisees.

i. A breakdown of CBL stores by café, kiosks and mall location traditional stores.

j. Accurately identify existing and former franchises.

k. Disclose Kevin Shaw's felony conviction for grand larceny.

l. CBL's contract with Pepsico for the provision of non-coffee based beverages or the rebates received by CBL on its franchisees' purchases of Pepsico products and kickbacks CBL received from Pepisco at the expense of its franchisees.

m. The required purchase by franchisees of the DMX Music system.

n. The menu change(s) that is/are planned for cafes, which required extra equipment and additional licenses that the franchise will have to obtain.

o. The required gift card program, the costs associated with the program, and kickbacks received by CBL from the processing company at the expense of its franchisees.

p. The profit markup that CBL charges on all equipment, fixture, and coffee that it sells to its franchisees.

q. The current telephone number and/or contact information for franchisees who have closed or were terminated, making it impossible for a prospective franchisee to investigate the former franchisees' experiences.

24.     A personal meeting among Welshans, Williams, and Kevin Shaw was held on or about June 4, 2003.

25.     A Uniform Franchise Offering Circular ("UFOC") for CBL was not distributed at the June 4, 2003 meeting between Welshans, Williams and Kevin Shaw, CBL's salesperson, as required by COMAR 02.02.10(H)(1). The UFOC provided to Williams was not the same UFOC that CBL had registered with  the State of Maryland.

**CBL's Fraudulent Statements and Omissions at Discovery Day**

26.     On or about June 13, 2003, Welshans and Williams attended a "Discovery Day" at CBL's headquarters in Flushing, Michigan.   During the Discovery Day, Welshans and Williams were given a tour of a company-owned Coffee Beanery Café. Neither Williams nor Welshans had expressed an interest in operating a café serving a limited food menu along with coffee, however, they were falsely told by CBL that CBL was at that time only selling Coffee Beanery Cafés.

27.     During the Discovery Day, Welshans and Williams were given a Franchise Agreement and a Maryland Rider to the Franchise Agreement and a Franchise Agreement for the operation of a Coffee Beanery Café to be executed.

28.     During Discovery Day, and before the execution of the Franchise Agreement, Kevin Shaw opined to Welshans and Williams that Welshans and Williams would net $125,000 per year when operating the Coffee Beanery Café.  Kevin Shaw had no reasonable basis for stating this opinion, and this opinion was not honestly entertained.

29.     During Discovery Day, and before the execution of the Franchise Agreement, Jim Briggs, a CBL employee, provided to Welshans and Williams pro forma variables and a software program in which the viables could be imputed.  The variables

were supposedly based on the performance of certain existing Coffee Beanery Café stores and would enable Welshan and Williams to calculate the income and profits of their proposed Coffee Beanery Café.

30.     The average income and expense projections set forth in the pro formas constituted an earnings claim as defined by the Maryland Franchise Registration and Disclosure Law. The projections were based on average café revenues of $407,000 in the first year of operations, which no café had attained. CBL had no reasonable basis for stating this projection, and this projection was not honestly entertained. CBL knowingly provided the $407,000 false projection because that was the projected revenue needed by franchisees to secure financing from financial institutions making Small Business Administration guaranteed loans.

31.     CBL's internal documents indicate that the actual average gross revenues for a Coffee Beanery Café were $260,000, at best.

32.     CBL presented its false projections to numerous prospective and actual franchisees knowing that the franchisees would present the false information to financial institutions (including the U.S. Small Business Administration) for the purpose of securing loans and loan guarantees to finance the build-out and operation of their cafes. Said Franchisees include but are not limited to:  James Peterson, Lee Pierce, Robert Griffiths, Oliver Garner, Lisa DePriest, Mary Sue Shagna-Levin, Kay Hur, Stan Bellows, Victoria [last name unknown] in New Jersey, and Carmela [last name unknown] in Texas.

33.     On Discovery Day, Welshans and Williams also paid to CBL the initial franchise fee of Twenty-Five Thousand Dollars ($25,000).

34.     Williams was told she did not have to sign the Franchise Agreement since it was to be transferred to an entity to be formed, of which she would be the majority owner.  That entity was WW.

35.     On or about August 1, 2003, the Franchise Agreement was assigned by Welshans to WW, LLC with the consent of CBL.

**Welshans and Williams' Cafe Build-out & Operations**

36.     Williams and Welshans were told that their Coffee Beanery Café would be designed by CBL and would be similar in appearance to the company-owned store that they toured on Discovery Day.

37.     CBL designed the layout and directed the furnishings and equipment to be installed in WW's Coffee Beanery Café.

38.     The layout and design chosen by CBL was not the design seen in the company-owned store toured by Plaintiffs on Discovery Day.  Instead of having a cafeteria style line with display cases along the way as customers placed and filled their orders before reaching the cash register, the design had the order placement and payment to be made up front thereby causing customers to congregate at the front of the store at the beginning and at the end of the order process, slowing the process down, discouraging customers, and creating the illusion to persons outside the store that the store had long lines.  Moreover, the layout did not promote customer browsing of the selections offered.

39.     CBL required WW to purchase a specific refrigerated display case for the display of pastries and for the sale of bottled beverages to be taken directly by the consumer.

40.     The refrigerated display unit is defective in that it dries out all of the pastries, repeatedly forms condensation on the inside of the unit and fills the bottom portion with water thereby requiring the customer to reach in and obtain bottles of beverages which were soaking wet.  Despite attempts to repair the refrigerated display unit, it has not been repaired, cannot be repaired and based upon information and belief it is the result of a defective design as other franchisees have experienced the same problem with their unit.  The refrigerator display unit is unusable.

41.     CBL required Plaintiffs to purchase a computerized cash register system consisting of two registers, a black box for computer interface and a computer.

42.     The cash register system is defective in numerous ways, including, but not limited to, the following:

    a.  Only one register can operate at any time.  If the store attempted to use two registers at the same time, the system froze and shut down.  Since only one register can be used at a time, it makes no sense for two to be ordered.  Moreover, two registers were needed during peak hours, but were not available.

    b.  The registers are not suitable for and are not designed for a cafe in that they cannot be properly used for customized orders of sandwiches and salads.  This caused delays in entering purchases which delayed the orders and caused customers to cease doing business with Plaintiffs.

    c.  The system software was at least 20 years out of date when purchased.

     d.   The system required Plaintiffs to manually re-key the information on daily sales at the end of each day into the computer to be delivered to CBL as required under the Franchise Agreement.

     e.   The system was prone to repeated freezes and shutdowns.  On at least three occasions, these shutdowns caused the store to close since the system can only be restored by CBL in Michigan and cannot be rebooted in the store.

43.    WW  paid 2% of gross sales to CBL for the Marketing Fund, later known as the Brand Building Fund.

44.    Despite demands, CBL has never provided Plaintiffs with an accounting of receipts and disbursements of the Marketing Fund as set forth in the UFOC.

45.    At all relevant times, Pilon was in charge of the gift card program of CBL. Pilon told Plaintiffs after the franchise was purchased that they had to participate in the system.  Pilon further falsely stated that the gift card insurance fund payments were necessary to cover losses from franchises who had left the system when in fact no such program is necessary as a gift card cannot be used unless money remains in the gift card account and on the card itself.  Money is transferred to a gift card account by the store in the amount of the card purchase upon the purchase.

46.    WW incurred operating losses of Three Hundred Twenty Four Thousand and Sixty-three Dollars ($324,063) in operating the Cafe from its opening until the Café closed for good on November 17, 2007.

47.    In addition, Welshans lent money to WW and paid capital in an amount in excess of $870,000.00 to WW to open and operate their Coffee Beanery Café.

48.     Williams and Welshans did not take any salary while working full time at their Coffee Beanery Café and drew no profits from the business as the business had no profits.

49.     Welshans and Williams had to borrow money from WW to live on.

50.     Had Plaintiffs been sold what was represented to them, they would have made $125,000 per year as they were told by Kevin Shaw.

**CBL's Continuing Scheme to Defraud Other Franchisees**

51.     The scheme to defraud evidenced by CBL's relationship with Welshans and Williams has been perpetrated by CBL against other franchisees for a substantial period of time and has become the regular way in which CBL does business.

52.     Since 2002 (and perhaps earlier), CBL has published UFOCs that make false representations to prospective franchisees and fraudulently omit material information.  As with Welshans and Williams, CBL's goal is to fraudulently induce prospective franchisees to invest in a Coffee Beanery Café franchise.

53.     CBL transmitted by U.S. or interstate wires fraudulent UFOCs to numerous prospective and actual franchisees for the purpose of fraudulently inducing them to invest in a Coffee Beanery Café, including, but not limited to: Sally Guirguis (2002), Clyde Sikien (2002), Robert Boyd  (2002), Mike & Lynda Group (2003), Glenn Wilson (2003), and Laura Deming (2003).

54.     As described below with particularity, CBL made false statements in the UFOCs.  During their effective period, all of the following UFOCs were mailed or emailed/faxed by interstate wire to multiple CBL franchise applicants and government regulators.

**History of Fraudulent UFOCs**

55.     CBL engaged in a pattern of presenting fraudulent misrepresentations and omitting material information in its UFOCs.   Said pattern includes the following misrepresentations, among others:

56.     In its UFOC dated September 30, 2006, CBL falsely states that it "began offering franchises on May 18, 1985 for specialty retail coffee stores or businesses in a variety of forms and locations, including kiosks, counters, malls and neighborhood café locations."

57.     In its UFOC dated September 30, 2006, CBL falsely states that its "first corporate café store opened in 1993 and we offered our first franchise for a café store in 1995."

58.     In its UFOC dated September 30, 2007, September 30, 2008, September 15, 2009, September 15, 2010, and October 1, 2011, CBL falsely states that it was "incorporated in Michigan on March 22, 1976 . . . [and] began offering franchises on May 18, 1985. . . . [O]ur first franchise for a café store [opened] in 1995."

59.     In its UFOCs dated September 30, 2007 and dated September 20, 2008, and in its Franchise Disclosure Documents ("FDDs", the successor document to the UFOC), dated September 15, 2009, September 15, 2010, and October 1, 2011, CBL falsely states that it "began operating Coffee Beanery stores at our inception in 1976 and have continuously done so since that date.  We began offering franchises for Coffee Beanery stores in May, 1985 and have continuously done so since that date."

60.     CBL fraudulently states the total estimated initial investment for a Coffee Beanery Café store (with food), including operating funds for the first three months, but

excluding marketing fees and royalty fees.  Such fraudulent statements are included in the following UFOCs and FDDs:

| | |
|---|---|
| September 14, 2004 | $335,000-$491,500 |
| September 20, 2005 | $348,000-$504,000 |
| September 30, 2006 | $355,500-$519,000 |
| September 30, 2007 | $68,375-$545,000 |
| September 30, 2008 | $68,375-$545,000 |
| September 15, 2009 | $326,000-$545,000 |
| September 15, 2010 | $326,000-$545,000 |
| October 1, 2011 | $326,000-$545,000 |

61.     CBL states that it has negotiated purchase arrangements with suppliers. CBL falsely states that it "ha[s] not negotiated any contracts with suppliers which gives us a better price than the price the supplier charges to franchisees."  This fraudulent statement appeared in UFOCs dated September 15, 2004, September 20, 2005, and September 30, 2006.  The UFOCs dated September 30, 2007 and September 30, 2008 and the FDD dated September 15, 2009 were modified to deceptively state: "We have not negotiated any contracts with suppliers which gives us a better price that the supplier charges to franchisees were we act as the retail purchaser of the item purchased."

62.     The UFOCs dated September 30, 2006, September 30, 2007 and September 30, 2008, and the FDD dated September 15, 2009 disclose that some CBL suppliers pay "rebates or incentives . . . to [CBL] . . . for purchases made by us and our franchisees."  CBL deceptively states: "These rebates or incentives have been paid by the Coffee Beanery to the Brand Building Fund. . . .  No portion of these rebates are retained by us."

63.     The FDDs dated September 15, 2010 and October 1, 2011, falsely state that "[a]pproved suppliers do not make payments to us on account of transactions with you or other franchisees . . . We have not negotiated any contracts with suppliers which

17

gives us a better price that the supplier charges to franchisees where we act as the retail purchaser of the item purchased. . . . .  We have negotiated purchase arrangements with one of our approved suppliers that provide rebates and incentives to be paid to the Coffee Beanery by such suppliers for purchases made by us and our franchisees. . . .  No portion of these rebates is retained by us."

64.    CBL deceptively states that estimates made in its UFOC's are based on "our [over] twenty (20) years of experience in the coffee business. . . ."  This deceptive statement appeared in UFOC's dated September 20, 2005, September 30, 2006, September 30, 2007, September 30, 2008, September 15, 2009, September 15, 2010, and October 1, 2011.

65.    CBL falsely states that all sums paid by franchisees into the marketing fund are maintained "in an account separate from our other monies, and will not use the advertising contribution to defray any of our expenses . . . ."  This fraudulent statement appeared in UFOCs dated September 15, 2004 and September 20, 2005.

66.    In its UFOCs dated September 30, 2006, September 30, 2007, September 30, 2008 and the FDD dated September 15, 2009, CBL altered its disclosure about the marketing fund (now known as the Brand Building Fund), stating "[w]e separately account for sums paid for the Fund in separate bookkeeping accounts.  We will not use the Brand Building contribution to defray any of our expenses . . . ."

67.    In its FDDs dated September 15, 2010 and October 1, 2011, CBL falsely states that "all contributions to the Fund (including amounts that we may receive as a result of rebate or incentive programs with our suppliers . . .), and any earnings on amounts in the Building Fund, must be used exclusively to meet all costs of maintaining,

administering, directing, conducting, and preparing advertising, marketing, public relations and/or promotional programs and materials, product placement and any other activities which we believe will benefit the System."

68.     The UFOCs and FDDs dated September 15, 2004, September 20, 2005, September 30, 2006, September 30, 2007, September 20, 2008, September 15, 2009, September 15, 2010 and October 1, 2011 falsely state that CBL has made no earnings claims to the franchisee(s).

69.     The UFOCs dated September 15, 2004, September 20, 2005, September 30, 2006, September 30, 2007 and  September 30, 2008 and the FDDs dated September 15, 2009, September 15, 2009, September 15, 2010, and October 1, 2011 falsely state that many CBL franchises were open, even though they were closed at the time of the UFOCs' publication.

70.     In an effort to fraudulently conceal the unprofitability of Coffee Beanery Cafés, CBL's UFOCs and FDDs (after 2002) did not distinguish between traditional stores and cafes.

71.     The UFOCs dated September 15, 2004, September 20, 2005, and September 30, 2006, September 30, 2007 and September 30, 2008 and the FDDs dated September 15, 2009, September 15, 2010, and October 1, 2011 fraudulently omit that:

a.   there is no separate marketing fund.

b.   With regard to the 2% weekly gross sales paid by the franchisees to the marketing fund, CBL had no intention to apply the use the fees in the fund for the purposes set forth in the UFOC.

c.  CBL required cafes to have 24 employees on the payroll prior to being allowed to open.

d.  Twenty-four employees are excessive and needlessly add to the overhead costs imposed upon franchisees.

e.  A breakdown of CBL stores by café, kiosks and mall location traditional stores.

f.  Accurate identifying information regarding existing and former franchises.

g.  Kevin Shaw's felony conviction for grand larceny.

h.  CBL's contract with Pepsico for the provision of non-coffee based beverages or the rebates received by CBL on its franchisees' purchases of Pepsico products and kickbacks CBL received from Pepsico at the expense of its franchisees.  In its UFOCs dated September 30, 2006, September 30, 2007 and September 30, 2008, and the FDD dated September 15, 2009, CBL discloses payments from Pepsico "rang[ing] from $0.45 to $0.70 per gallon of Store purchases of [Pepsi] in 1999. . . . No payments of any type have been made by Pepsi to us since 1999."

i.  The required purchase by franchisees of the DMX Music system.

j.  The required gift card program, the costs associated with the program, and kickbacks received by CBL from the processing company at the expense of its franchisees.

k.  In its UFOC's dated September 30, 2008 and September 15, 2009 (among others), CBL acknowledged receiving kickbacks from various vendors,

including CAP, Norpac, and Solo Cup.   These kickbacks were not previously disclosed to the franchisees.

l.   The profit markup that CBL charged on all equipment, fixture, and coffee that it sold to its franchisees.

72.   In its UFOCs and FDDs, CBL fraudulently omits the current telephone number and/or contact information for franchisees who had closed or were terminated, making it impossible for a prospective franchisee to investigate the former franchisees' experiences.   Rather, the UFOCs and FDDs list only the contact information for the store location that was recently closed.   In particular:

a.   The UFOC dated September 15, 2003 fails to provide effective contact information for the following franchisees:   Mike Kessinger, Brian Rosen, Honey Baked Ham, George Serra, Edmund Trasatti, Bob Raymond, Corporate (2 locations) and Arnand Paul.   Of the 14 listed owners of closed stores, only 5 had effective contact information.

b.   The UFOC dated September 15, 2004 fails to provide effective contact information for the following franchisees: Clyde Simien, Richard Popp, Linda Butkus, Rick Barnette, Jim Knapp, Jay Jun, Ernesto Ramirez, and Sonhui Kim. Of the 13 listed owners of closed stores, only 5 had current contact information.

c.   The UFOC dated September 20, 2005 fails to provide effective contact information for the following franchisees: Nooruddin Kurji, Sharif Khwaja, Victor Vigano, Allen Hart, Alan Kerr, Hartland LLC, Alan Schlessman, Jorge Padilla, Jan Lee, Kee Lee, Sam Guirguis, Moses Doleh,

Little Ceasars, Allen Kim, Laura Demming, Stan Bellows, and Wesco, Inc.  Of the 22 listed owners of closed stores, only 4 had current contact information.

d.   The UFOC dated September 30, 2006 fails to provide effective contact information for the following franchisees:  John Loyld, Anand and Esther Paul, Frank and Sharon Richardson, George Serra, Jeff and Nancy DeLay, Deane Kitts, Tammy and Carl Tannehill, Edward V. Boornazian, Honey Baked Ham Company, Scott Barbat, Gergory Bell, Bhavna Thomas, Mohammad Basith, Glenn Wilson, and Oliver Garner.  Of the 24 listed owners of closed store, only 9 had current contact information.

e.   The UFOC dated May 15, 2008 fails to provide effective contact information for the following franchisees:  Parker Enterprises, Inc., John Wright, LKPK Ltd., Just Baked, Inc., M and R Stores Inc., Carl and Tamme Tannehill, Marlie Prost and Keiko Denbeau, Carpetena, John and Sandy Eckhardt, Manisha Holdings, LLC, Kenneth Barber, Valerie and Robert Griffiths, Bob's Enterprises, Inc., Marysue Shagena, K& P Ventures, Bisbil Corporation, James and Vivian Sirakis, Scott Tonkovich and Henry West, Kevin Zeban, and Chang Hur Enterprises, LLC.  Of the 36 listed owners of closed stores, only 13 had current contact information.

f.   The UFOC dated September 30, 2008 fails to provide effective contact information for the following franchisees: Patrick and Regina Morris, Robert Stevenson and Louis Backus, Messina Family Inc., Merco Group, Isa and Rounak Mehrjoo, Don't Spill the Beans Coffee, WW, Whiteleaf

Inc., 3 J's Restaurant, Inc., North Topsail Ventures, LLC, K&P Ventures, SGMM LLC, and Deepak Batra.  Of the 14 listed owners of closed stores, zero had current contact information.

      g.  The FDD dated September 15, 2009 fails to provide effective contact information for the following franchisees: ATIPA Inc., VG's Food Center, Inc., Peter and Lily Kwan, Younes Saab, and TLM Distributing, Ltd.  Of the 15 listed owners of closed stores listed, only 9 had current contact information.

73.     In UFOCs dated September 15, 2003, September 15, 2004 and September 20, 2005, the Shaws disclose that their holding company owns Shaw Services, Inc., which "provides wholesale coffee, tea and associated product . . . [and] may enter into product distribution agreements. . . ." In UFOC's dated September 30, 2006, September 30, 2007, September 30, 2008, September 15, 2009, September 15, 2010, and October 1, 2011, the Shaws disclose that Shaw Services, Inc. "purchases coffee products from us and provides wholesale coffee, tea and associated product under various labels to businesses other than us or our franchisees.  It may periodically provide Coffee Beanery branded products under various marketing programs . . . ."  CBL franchisees receive a Shaw Services, Inc. warehouse credit when they sign-up for the Café Development program. Upon information and belief, Shaw Services, Inc. does not sell coffee and coffee products to franchisees at cost.  CBL has never disclosed the profit margin made by Shaw Services, Inc. in its sales to CBL franchises.

74.     Upon information and belief, since 2002, the law firm of Pear, Sperling, Eggan & Daniels, P.C. has compiled and completed the UFOCs and FDDs of CBL with

false or deceptive information provided by CBL, JoAnne Shaw, Julius Shaw, Kurt Shaw, Kevin Shaw, Owen Stern, and other employees and agents of CBL.  Plaintiffs do not currently allege that Pear, Sperling, Eggan & Daniels, P.C. had knowledge of the falsity of CBL's information at the time it complied the UFOCs and FDDs.

**Franchisee Coffee Beanery of Grand Blanc, L.L.C. ("CBGB")**

75.     CBGB invested in an unsuccessful CBL café franchise in the late-1990s or early-2000s.  CBGB later complained to CBL that, prior to acquiring the franchise, CBGB was shown projections by CBL that suggested a significant profit potential for the business and that by the second year the business would be generating a profit.  CBGB lost $76,000 in 2001 and expected the same or greater losses in 2002.  CBL also showed projections that CBGB's sales would be $480,000 in the second year and $552,000 in the third year.  In reality, CBGB's sales barely exceeded $250,000 per year.

76.     CBGB also complained that since investing in CBL, it had learned that the café concept has not been successful and that, contrary to having a proven history, only two café-type stores were open when CBGB entered its agreement.  CBGB stated that, contrary to CBL's representations, the café stores were "not a tried and true concept."

**Franchisee Ernesto Ramirez**

77.     Franchisee Ernesto Ramirez ("Ramirez") began investigating franchise opportunities in 1999.  Ramirez traveled from Pennsylvania to Florida to attend the 1999 CBL franchise meeting that year.  With CBL representatives, Ramirez toured a store that was purportedly doing "over half a million dollars and was on its way to a million a year in revenue." Ramirez later learned that the Florida café was situated in a unique market

with high demand for take-out sandwiches and other food items and the café's revenues had little to do with coffee sales.

78.     In mid-January 2000, Ramirez flew from Pennsylvania to Michigan to meet with the Shaw family. He had dinner with Kevin Shaw and met with Joanne and Julius Shaw. Ramirez purchased a master franchise for five stores in Bucks County, Pennsylvania.   Ramirez paid $25,000 upon entering the master franchise agreement and was further obligated to pay $5,000 per every store that opened.

79.     During the January 2000 meetings in Michigan, Kevin Shaw, Julius Shaw, Stern and JoAnne Shaw represented that the cafes were a "proven concept."  JoAnne Shaw said that they had recently made some adjustments but that the basic concept was a "proven success."  Kevin Shaw, JoAnne Shaw, Julius Shaw, and Stern indicated that each store would make $500,000 or $45,000 per month in gross revenue and continued to make similar assurances to Ramirez during the months prior to his first store opening in February 2001.  CBL executes repeatedly cited the success of the Florida store, stating: "its on its way to making $1 million per year."

80.     During his January 2000 meeting in Michigan and thereafter, the Shaws and Stern projected that Ramirez's total capital investment would be $250,000 per store but it was ultimately closer to $400,000 per store.  Similar projections were provided in CBL's "invitation to franchisee" leaflet, but CBL stopped the distribution of this leaflet.

81.     Ramirez opened his first Coffee Beanery Café in February 2001 in Doylestown, Pennsylvania and the second store in mid-March 2001 in Warrington, Pennsylvania. Both stores were built-out and operated as instructed by CBL.

82.     Problems soon became evident.   For instance, CBL demanded that Ramirez hire almost double the number of people that were needed to operate the cafes. CBL personnel were constantly changing. The Marketing Director changed 2-3 times, and the Real Estate Director was also replaced at least once during the initial months.

83.     Ramirez's stores experienced low traffic volume, despite CBL's approval or selection of the store locations. Ramirez invested in substantial advertising, including a local television campaign that was totally designed, managed, and financed by Ramirez. Although CBL provided no help or support, it demanded a copy of Ramirez's advertisements and showed the advertisements at its annual convention.

84.     Ramirez did not receive the support promised prior to his entering the franchise agreement. At the time his stores opened, CBL was not even able to provide the price/menu charts, and the Cash register system was still being tested at Ramirez's store, causing him to incur substantial expense.

85.     During the first 12 months of operation, CBL imposed constant changes on Ramirez's stores, including menu and product changes, such as test marketing for fruit smoothies, panini sandwiches, and a variety of gift shop items. Contrary to CBL's representations, it became evident to Ramirez that nothing about the café concept had been proven.

86.     Upon opening the stores, Ramirez began to suffer substantial losses each month, even after eliminating one-time expense items and the expense of testing new concepts. By August 2001, Ramirez prepared a business analysis, and it was clear that the cafés could not be operated profitably.

87.     Ramirez again travelled to Michigan in late September 2001 and presented his findings to Joanne Shaw.  She then called a meeting that included Julius Shaw, Kevin Shaw, and the CFO. After hearing the results of Ramirez's dilemma, none of them proposed a solution. Ramirez asked for and received permission to stop paying royalties on sales and was also promised a larger discount on supplies.  Thereafter Ramirez lost an average of $5,000 per month per store. Ramirez estimated that each café needed to make $45,000 in gross revenue every month, to make a small return. Ramirez's cafes were in the range of $25,000 -$ 27,000 per month in gross revenue.

88.     As of September 2001, Ramirez knew the café concept could not operate at a profit and shared this with CBL during his meeting in Michigan.  CBL, the Shaws, and Stern nonetheless continued to promote the franchise and to sell it to many investors, using the same false representations that were made to Ramirez. CBL never tested the café concept before marketing it to franchisees. The franchisees were CBL's test market. The café concept was certainly not "proven" in any sense.

89.     Ramirez was in disbelief that CBL continued to market and signup café franchisees after his September 2001 meeting with CBL. Ramirez was so outraged by CBL's continuing fraud that he attended the CBL convention in late 2002 in Las Vegas, Nevada for the sole purpose of convincing CBL to stop marketing the café concept and/or to convince others not to invest in the cafe concept.

**Franchisee Laura M. Deming**

90.     In April 2003, Laura M. Deming ("Deming") began researching franchise opportunities and spoke to Kurt Shaw of CBL.  Kurt Shaw stated that CBL was not interested in opening any more traditional stores and wanted to open cafés instead.  Kurt

Shaw falsely stated that the broader menu selection at cafés lead to more profits and generated more traffic.  Kurt Shaw stated that Deming should quit her job and that she would soon be living the "good life" with enough money to "go to Hawaii."

91.     Deming also attended a discovery day and was falsely told by Stern that there was minimal risk in the investment in a café and that 80 to 90% of the CBL franchises were profitable.  Stern said that either Deming or her husband should quit her job and operate the store fulltime.  Stern said that CBL could not open stores fast enough.

92.     Deming and her husband executed a CBL franchise agreement on or about October 27, 2003.  In searching for a location, Kevin Shaw encouraged Deming to purchase a building with double drive-thru windows, saying it was perfect and the way of the future.  Kevin Shaw further falsely told Deming that CBL was geared up to open a significant number of double drive-thru stores.  Stern also falsely assured Deming on multiple occasions that CBL had extensive experience with drive-thru stores.

93.     On January 23-24, 2004, Deming attended a CBL National Advisory Board meeting in Michigan with other franchisees.  When Deming stated that her goal was to break even, the other franchisees chuckled and stated that this was everyone's goal but the businesses were struggling and no one was making a profit.

94.     Deming underwent CBL training in May – June 2004, Deming was distraught to learn that her store would be CBL's first drive-thru location.

95.     Deming opened her store in September 2004.  When Deming's store began to struggle, she asked Stern to provide a sandwich product that would result in lunch-time traffic.  Stern told Deming that that she did not want to be in the food business as it was a money loser and the cafes were not making it.  He said she should stay away

28

from food if she wanted to make a profit.  Deming's store suffered severe financial difficulties from month-to-month and eventually closed.

**Franchisee Oliver Garner**

96.     Oliver Garner ("Garner") was searching for a good franchise investment in late-2003 and early-2004.  Garner met with the Minority Business Partnership ("MBP"), which he believed was a non-profit organization whose objective was to assist minority businesses.  The MBP strongly recommended and encouraged Garner to open a CBL franchise.

97.     On February 20, 2004, Garner submitted an application and business plan to CBL.  In March 2004, he received the CBL UFOC dated September 15, 2003.

98.     In July 2004, before he signed the CBL Franchise Agreement, Garner was falsely told by MBP (or its affiliates) that he did not have to personally guarantee the loan to buy and open a Coffee Beanery franchise because the stores "have sales of $1.2 million in the first two years and make at least $500,000 in profit over the first five years of operation."  MBP did not have any reasonable basis for these projections and the opinions were not honestly entertained.

99.     Garner also attended a Discovery Day event and met with Kurt Shaw. Kurt Shaw falsely represented, among other things, to Garner that "there was minimal risk in the investment in a café, and that the only stores not profitable were those whose owners did not follow the guidance of CBL."  Garner was further told to quit his job and that CBL could not open locations fast enough.

100.     On or about July 29, 2004, Garner executed a CBL franchise agreement and paid one half of the initial transfer fee ($25,000) to CBL.  Garner leased property for

the café and borrowed $320,000 from a financial institution to finance build-out and initial purchases.  The loan was secured by a mortgage on his home.

101.    During the build out of the café, Garner discovered that CBL had not disclosed material information, such as the required investment in the DMX and Remote Eyes System and CBL's requirement that he hire 25 people (far more employees than CBL had previously told him were required).

102.    Garner's café opened on April 5, 2005.  Garner thereafter experienced that the average customer ticket at the café was too small to allow the café to operate profitably.   Garner states that CBL was aware that the café stores concept could not operate profitably but failed to disclose that information to him. On or about February 2006, Garner was evicted from the café premises.  He lost money every month he was operating his CBL franchise.

103.    In September 2005, CBL disclosed (for the first time) that MBP (or its affiliates) had received all or most of the initial franchise fee paid by Garner to CBL.

**UFOC Litigation Reports**

104.    All of CBL's UFOCs contain litigation reports indicating its litigation with former and current franchisees.  Many of these reports indicate suits by other franchisees arising out of circumstances similar to those experienced by Welshan and Willams.  For example:

        a.  The October 15, 2001 UFOC (among others) reports Stephen and Renee Klarberg brought action against CBL, alleging that CBL had wrongfully given false sales figures.

b.   The September 30, 2007 UFOC (among others) reports an investigation by the Illinois Attorney General regarding CBL's "franchising program" in Illinois; litigation filed by former franchisee, Garner, "making identical claims" to WW (Welshans and William's company); and a claim for negligent misrepresentation brought by another franchisee and settled by CBL. According to subsequent UFOC's, Garner's claim was settled by CBL paying consideration to Garner on March 28, 2008.

c.   The September 30, 2008 UFOC and the September 15, 2009 FDD (among others) report that Deming brought "identical claims" to those filed by WW (Welshans and William's company). According to subsequent UFOCs, Deming's claim was settled by CBL paying consideration to Deming.

d.   The September 15, 2010 FDD discloses that CBL paid a franchisee, Lisa DePriest, $20,000 to settle claims for detrimental reliance, negligence, and intentional misrepresentation.

**Testimony of Dave Gausden, Former COO of CBL**

105.   Dave Gausden ("Gausden") was COO of CBL from 1994 through 2002. In that capacity, Gausden was responsible for CBL's marketing, franchise sales, and real estate operations.

106.   Gausden has testified under oath to the following facts:

a.   There never came a time when the CBL corporate-owned cafés were profitable.

31

b.  The cafés were not profitable because the average ticket (i.e., the amount spent in the store by the average customer) was too low.

c.  CBL undertook many efforts to make the cafés more profitable.  For example, they hired a chef from the Atlanta Culinary Institute to put a "quick and dirty sandwich menu together."

d.  The café concept was always problematic because CBL had not created a model.  CBL was facing substantial financial problems and the focus was saving the company, not developing a café model.

e.  After CBL was out of immediate financial jeopardy, Gausden was responsible for developing a working café model.  He "never made the model work."  During his entire time with CBL, the café model never worked.

f.  CBL's management (JoAnne Shaw, Julius Shaw, Kurt Shaw, Kevin Shaw and Stern, among others) knew that the corporate-owned cafés were never profitable because everyone on the management team received profit and loss statements.  The café concept was also a regular topic at management meetings.  All the managers knew "[w]e weren't making the sales levels."

g.  Although CBL never developed a working model, CBL kept promoting the café concept to prospective franchises and kept selling franchises based on the café concept.

h.  CBL kept promoting and selling the café concept to prospective franchisees even after existing franchisees started to complain:  "they

complained in the sense that they weren't successful, they were losing money, and they were asking for help, and looking to us to help them out."

i.  CBL did not dwell on the fact that the café concept did not work. The mantra at CBL was: "We have to make these things work."

j.  CBL nor any of its management team disclosed to franchisees that the café concept did not work.

k.  Gausden testified that he left CBL because "I didn't make the concept work."

**Testimony of Bob Duha, Former Director of New Store Systems of CBL**

107.  Bob Duha ("Duha") was Controller or Director of New Store System of CBL from 1998 through 2003.

108.  Duha has testified under oath to the following facts:

a.  The average annual sales at cafés were approximately $350,000.

b.  According to Duha and Stern, the store build out costs should be equal to twice the annual sales.   Actual build-out costs were at about a one-to-one ratio with annual sales rather than a two-to-one ratio.

c.  Duha never disclosed to prospective franchises that build-out costs should be equal to twice the annual sales.

d.  CBL management (JoAnne Shaw, Julius Shaw, Kurt Shaw, Kevin Shaw and Stern, among others) often talked about the unprofitability of the café concept but, nonetheless, continued to promote and sell the concept to prospective franchisees.

e.   Duha did not know of any cafés sold while he was with CBL that were profitable.  All franchisees were required to report their sales data.

f.   Kevin Shaw operated a Coffee Beanery franchise but did not use CBL to layout the store and purchase the equipment because "[h]e thought that he could do it cheaper than what we could do it."

g.   Kevin Shaw obtained retail prices from equipment vendors and used retail prices to sell equipment to franchisees rather than the wholesale price charged to CBL by the vendors.

h.   Duha never had any discussions with other executives about whether CBL should stop selling the café concept until they figured out a way to make them successful.  Some CBL employees had informal discussions about whether the cafés should be sold.

i.   Although the café concept did not work, CBL and its management team continued to promote and sell the concept.

109.   CBL has promoted the café concept to franchisees since 2002 (at a minimum) not because the café concept is more profitable than a traditional store, but because the malls, airports and other high traffic areas where traditional stores are located required CBL to guarantee the franchisee's lease.  Given CBL's dire financial straits since early 2000s, banks refused to extend credit to CBL unless it refrained from guaranteeing franchisee leases.  Landlords for the cafés, located in stand-alone buildings in residential neighborhoods, did not require guarantees from CBL.

**COUNT I**
**(Violation of Maryland Franchise Act)**

110.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 109 of the Amended Complaint as if fully set forth herein.

111.    The UFOC was not provided to Williams and Welshans in accordance with the Code of Maryland Regulations ("COMAR") 02.02.10(H)(1).    It was not provided at the first personal meeting of CBL, Welshans and Williams in May 2003.

112.    The UFOC that was provided by CBL violates both the Maryland Franchise Act and COMAR in that it is incomplete, inaccurate, and that it contains untrue statements of material facts, in, among other ways, as follows:

    a.  It does not contain any relevant information as to the Café concept by misstating or failing to identify when the Café concept was first offered, how many Café franchises had been sold, how many Café franchises have been terminated and how many Café franchises had been transferred.

    b.  It fails to disclose the required participation in the "gift card" program and the additional equipment required for the gift card program.

    c.  It failed to disclose the required purchases of Pepsico products and the rebates provided by Pepsico to CBL.

    d.  If failed to disclose the required purchase of the DMX Music System.

    e.  It failed to disclose the felony conviction of Kevin Shaw for Grand Larceny.

    f.  It was not the same UFOC which was registered with the State of Maryland.

    g.  It does not include the November 30, 2002 unaudited financial statement which it falsely states is attached as part of Exhibit C.

     h.   It understates construction and furniture, fixture and equipment costs.

     i.   It did not properly or accurately identify current and former franchises of

        CBL.

113.   The Franchise Agreement violated the Maryland Franchise Act and COMAR in that it contained untrue statements of fact.  Contrary to the terms of the Agreement CBL did not apply the 2% gross sales paid for marketing to a Separate Fund..

114.   Under §14-227 of the Maryland Franchise Act, Plaintiffs are entitled to damages arising from the grant of the franchise.

115.   Plaintiffs have sustained damages in the amount of Two Million Dollars ($2,000,000) arising from the grant of the Coffee Beanery Café to them.

116.   Pursuant to §14-227(c) of the Maryand Franchise Act, the officers and directors of CBL and all persons who directly or indirectly control a person who is liable if they had knowledge that false representations were being made and employees, if the employees materially aid in the act or action that is a violation of the subtitle, are liable to Plaintiffs for all damages incurred.

117.   Defendants JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Coxen, Stern and Pilon were officers of CBL and had knowledge that false representations were made.  Kevin Shaw and Coxen materially aided in the act actions that are violations of the  Maryland Franchise Act, and, upon information and belief, JoAnne Shaw, Julius Shaw, Kurt Shaw, Stern and Pilon materially aided in the acts and actions that are violations of the Maryland Franchise Act.

118.    Pursuant to the terms of the Franchise Agreement, the attorneys' fees and costs in any litigation concerning the Agreement are to be awarded to the prevailing party.

119.    Accordingly, under §14-227 of the Maryland Franchise Act, Plaintiffs are entitled to rescission and to recover damages sustained by the grant of the franchise from Defendants CBL, JoAnne Shaw, Julius Shaw, Kurt Shaw, Kevin Shaw, Coxen ,Stern and Pilon.

WHEREFORE, Plaintiffs seek compensatory damages, jointly and severally, against Defendants CBL , JoAnne Shaw, Julius Shaw, Kurt Shaw, Kevin Shaw, Coxen, Stern and Pilon  for Two Million Dollars ($2,000,000), along with attorneys' fees, costs and such other relief as this Court deems necessary and proper.

## COUNT II
### (Detrimental Reliance)

120.    Plaintiffs incorporate by reference Paragraphs 1 through 119 of the Amended Complaint as if fully set forth herein.

121.    Williams, Welshans and WW relied on the representations of CBL and Kevin Shaw in expending monies in connection with the grant of the franchise for the Coffee Beanery Café in Annapolis, Maryland and in foregoing other opportunities.

122.    Plaintiffs' reliance was reasonable.

123.    CBL and Kevin Shaw reasonably expected that their representations and promises would induce action on the part of Plaintiffs, which reasonable and actual actions it induced to the detriment of Plaintiffs.

WHEREFORE, Plaintiffs seek compensatory damages against Defendants CBL and Kevin Shaw, jointly and severally, in the amount of Two Million Dollars

($2,000,000.00), along with attorneys' fees, interest, costs and such other relief as this Court deems necessary and proper.

## COUNT III
### (Intentional Misrepresentation)

124.    Plaintiffs incorporate by reference Paragraphs 1 through 123 of the Amended Complaint as if fully set forth herein.

125.    Orally, before the Franchise Agreement was executed and in the UFOC, CBL, Kevin Shaw, Coxen,  Stern and Pilon  made false statements to Williams and Welshans as to the experience of CBL in operating franchises under the Café system, the earnings Plaintiffs could expect from operating the Coffee Beanery Café in Annapolis, Maryland, the number of Coffee Beanery Cafés which were open and operating, and which were transferred and terminated, the costs and expenses of opening and operating the Coffee Beanery Café, the equipment required for the Coffee Beanery Café, the gift card  program, the reliability and utility of the equipment required for the Coffee Beanery Café, the names and identity of current and former franchises and the application of the Marketing Fund monies paid by WW to the Fund.

126.    These representations were false when made or were made with reckless disregard as to their truth or falsity.

127.    Defendants made these representations for the purpose of inducing William and Welshans to enter into a Franchise Agreement for a Coffee Beanery Café with CBL.

128.    Plaintiffs' reliance on the misrepresentations was reasonable.

129.    The representations were made with the intent to injure Plaintiffs and with actual malice.

130.    Plaintiffs suffered compensatory damages in the amount of Two Million Dollars ($2,000,000.00) as a direct and proximate result of their reliance on the misrepresentations made by Defendants CBL, Kevin Shaw, Coxen and Stern.

WHEREFORE, Plaintiffs seek compensatory damages, jointly and severally against Defendants CBL, Kevin Shaw, Coxen and Stern in the amount of two million dollars ($2,000,000.00) and punitive damages in the amount of Six Million Dollars ($6,000,000.00), along with attorneys' fees, interest, costs and such other relief as this Court deems necessary and proper.

## COUNT IV
### (Negligent Misrepresentation)

131.    Plaintiffs incorporate by reference Paragraphs 1 through 130 of the Amended Complaint as if fully set forth herein.

132.    The representations of CBL, Kevin Shaw, Coxen and Stern to Plaintiffs were made negligently.

133.    WHEREFORE, Plaintiffs seek compensatory damages, jointly and severally, against Defendants CBL, Kevin Shaw, Coxen and Stern, jointly and severally, in the amount of Four Million Dollars ($4,000,000), along with attorneys, fees, interest, costs and such other relief as this Court deems necessary and proper.

## COUNTs V through VIII
### (RICO)

134.    Plaintiffs incorporate by reference Paragraphs 1 through 133 of the Amended Complaint as if fully set forth herein.

**Mail Fraud**

135.    CBL, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, and their co-conspirators perpetrated a scheme to fraudulent obtain the money and property of the CBL franchisees. JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, and their co-conspirators knowingly devised or knowingly participated in a scheme or artifice to defraud CBL franchisees or to obtain the money or property of CBL franchisees by means of false or fraudulent pretenses, representations, or promises.

136.    CBL, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, and their co-conspirators acting singly and in concert, personally or through their agents or corporate alter egos (including CBL), used the U.S. Postal Service and interstate wires or caused the U.S. Postal Service or interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud the CBL franchisees, within the meaning of 18 U.S.C. §§ 1341 and 1343.

137.    In particular, CBL, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, and their co-conspirators and agents knew or could foresee that the U.S. Postal Service and interstate wires would be used to receive and/or deliver, *inter alia*, UFOCs, franchise agreements, acknowledgement forms relating to franchise agreements, correspondence relating to the marketing and sale of CBL franchises, telephone calls to discuss and negotiate the terms of CBL franchise sales, funds for the payment of franchise fees, loan documents to and from financial institutions that financed franchisee build-out and operational costs, and funds for the payment of royalty fees.

138.    It is not possible for Plaintiffs to plead with particularity all instances of mail and wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the

exclusive knowledge of CBL, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, their co-conspirators, their agents, and other presently unknown individuals.  For instance, CBL, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, their co-conspirators and agents have exclusive control over information regarding when fraudulent UFOCs were transmitted to government regulators, when fraudulent UFOCs were transmitted to prospective franchisees, the identities of prospective franchisees to whom the fraudulent UFOC's were transmitted, complaints filed by franchisees after discovering or suspecting that the café could not be profitable, and communications designed to conceal the fact that CBL had never developed a workable café concept and to cast blame on the franchisees.

139.   By way of example, however, CBL, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, and their co-conspirators or agents specifically used the U.S. Postal Service or interstate wires or caused the U.S. Postal Service or interstate wires to deliver each and every telephone call, email, letter, or other communication described in paragraphs 21-107 (*supra*), among others.   All of the communications described herein were for the purpose of advancing, furthering, executing, and concealing the scheme to defraud the CBL franchisees.

140.   Upon information and belief, some or all of the wire communications described above and occurring between persons in the same state crossed interstate borders by reason of the technology and other mechanisms used to transmit the communication.

141.   Each and every use of the U.S. Postal Service or interstate wires described above was committed by CBL, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, and their co-conspirators with the specific intent to defraud the CBL franchisees or for

obtaining the money or property of the CBL franchisees by means of false or fraudulent pretenses, representations, or promises. CBL'S, JoAnne Shaw's, Julius Shaw's, Kevin Shaw's, Kurt Shaw's, Owen Stern's, and their co-conspirator's and agent's acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 constituted racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

142.    The CBL franchisees (or their agents) justifiably relied on CBL's, JoAnne Shaw's, Julius Shaw's, Kevin Shaw's, Kurt Shaw's, Owen Stern's, or their co-conspirators' or agent's fraudulent representations and omissions made pursuant to the above-described scheme in that, among other things, franchisees incurred travel expenses and lost work time to investigate and negotiate their purchase of the CBL franchise, paid franchise fees, incurred debt to finance the build-out and operation of their stores, secured the incurred debt with liens on homes and other property, purchased equipment and services for purposes of operating their stores, hired and paid employees to staff their stores, and paid royalties.

**Financial Institution Fraud**

143.    CBL, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, and their co-conspirators knowingly executed a scheme or artifice to obtain the moneys, funds, credits, assets or other property under the custody or control of various financial institutions by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1344 in that, among other things, CBL, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, Owen Stern, and their co-conspirators and agents presented or caused to be presented to CBL franchisees false financial information, projections, and estimates knowing and intending that financial institutions (including the U.S. Small Business Administration) would rely on such false financial information when approving or

guaranteeing loans, credit, and other financial obligations of CBL franchisees  (*See supra*
¶¶ 30, 32, 96, and 99.)

## COUNT V
### (RICO)
### 18 U.S.C. § 1962(c)
**(Against JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern)**

144.    Plaintiffs incorporate by reference Paragraphs 1 through 143 of the
Amended Complaint as if fully set forth herein.

145.    Since 1999 and continuing to the present (at a minimum), the following legal
entity constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c):
CBL.

> (a)    JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen
> Stern are each "persons," within the meaning of 18 U.S.C. §§ 1961(3) &
> 1962(c), who individually associate with and/or participate in the conduct of
> said enterprise's affairs through a pattern of racketeering activity.

> (b)    JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen
> Stern operate and manage CBL as set forth in Item 2 of CBL's UFOC's.

> (c)    Since 1999 and continuing to the present (at a minimum), JoAnne
> Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern each
> individually conducted, participated in, engaged in, and operated and
> managed the affairs of CBL through a pattern of racketeering activity within
> the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). JoAnne Shaw's,
> Julius Shaw's, Kevin Shaw's, Kurt Shaw's, and Owen Stern's pattern of
> racketeering activity consists of the acts of mail and wire fraud (described in

paragraphs 21-108 and 134-142, *supra*) and bank fraud (as described in paragraphs 21-108 and 143, *supra*).

146.    In the alternative to paragraph 145, since 1999 and continuing to the present (at a minimum), the following individuals (or any combination thereof) constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact": the executive management and employees of CBL ("CBL AIF Enterprise").

(a)    JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern are each "persons," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associate with and/or participate in the conduct of said enterprise's affairs.

(b)    Members of the CBL AIF Enterprise share the common purpose of (among other things) defrauding CBL franchisees of money or property and / or of selling CBL franchises.  Members of the CBL AIF Enterprise are all related in that they are/were all employees of CBL.  The also CBL AIF Enterprise possess sufficient longevity for the members to carry out their purpose(s) in that the CBL AIF Enterprise has existed since 2000 (at a minimum).

(c)    Since 1999 and continuing to the present (at a minimum), JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern each individually conducted, participated in, engaged in, and operated and managed the affairs of the CBL AIF through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).

JoAnne Shaw's, Julius Shaw's, Kevin Shaw's, Kurt Shaw's, and Owen Stern's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 21-107 and 132-140, *supra*) and bank fraud (as described in paragraphs 21-107 and 141, *supra*).

147.    In the alternative to paragraphs 145 and 146, since 1999 and continuing to the present (at a minimum), the following individuals (or any combination thereof) constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact": JoAnne Shaw, Julius Shaw, Kevin Shaw, and Kurt Shaw ("Shaw Enterprise").

(a)    JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern are each "persons," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associate with and/or participate in the conduct of said enterprise's affairs.

(b)    Members of the Shaw Enterprise share the common purpose of (among other things) defrauding CBL franchisees of money or property and / or of selling CBL franchises.  Members of the CBL AIF Enterprise are all related in that they are members of the Shaw Family.  The Shaw Enterprise possess sufficient longevity for the members to carry out their purpose(s) in that the Shaw Enterprise has been selling franchises since 2000 (at a minimum).

(c)    Since 1999 and continuing to the present (at a minimum), JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern each individually conducted, participated in, engaged in, and operated and

managed the affairs of the Shaw Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). JoAnne Shaw's, Julius Shaw's, Kevin Shaw's, Kurt Shaw's, and Owen Stern's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 21-108 and 134-142, *supra*) and bank fraud (as described in paragraphs 21-108 and 143, *supra*).

148.    In the alternative to paragraphs 145 through 147 since 2002 and continuing to the present (at a minimum), the following legal entity constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c): Pear, Sperling, Eggan & Daniels, P.C. ("PSED").

(a)     JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern are each "persons," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associate with and/or participate in the conduct of said enterprise's affairs through a pattern of racketeering activity.

(b)     Since 2002 and continuing to the present (at a minimum), JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern each individually conducted, participated in, engaged in, and operated and managed the affairs of PSED through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). JoAnne Shaw's, Julius Shaw's, Kevin Shaw's, Kurt Shaw's, and Owen Stern's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 21-108 and 134-142, *supra*) and bank fraud (as described in paragraphs 21-108 and 143, *supra*).

149.   In the alternative to paragraphs 145 through 148, from May 2003 through November 2007 (at a minimum), the following individuals (or any combination thereof) constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they were "a group of individuals associated in fact":   Richard Welshans and Deborah Williams (Welshans / Williams Enterprise).

(a)      JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern are each "persons," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of said enterprise's affairs.

(b)      Members of the Welshans / Williams Enterprise shared the common purpose of (among other things) operating a CBL franchise.  Members of the Welshans / Williams Enterprise were all related in that they were cohabitating partners.  The Welshans / Williams enterprise also possessed sufficient longevity for the members to carry out their purpose(s) in that they financed, built-out and operated a CBL franchise from May 2003 through November 2007.

(c)      From May 2003 through November 2007, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern each individually conducted, participated in, engaged in, and operated and managed the affairs of the Welshans / Williams Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). JoAnne Shaw's, Julius Shaw's, Kevin Shaw's, Kurt Shaw's, and Owen Stern's pattern of racketeering activity consisted of the acts of

mail and wire fraud (described in paragraphs 21-108 and 134-142, *supra*)

and bank fraud (as described in paragraphs 21-108 and 143, *supra*).

150.    In the alternative to paragraphs 145 through 149, from August 2003 through November 2007 (at a minimum), the following legal entity constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c): WW.

(a)    JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern are each "persons," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of said enterprise's affairs.

(b)    From August 2003 through November 2007, JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern each individually conducted, participated in, engaged in, and operated and managed the affairs of the WW through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). JoAnne Shaw's, Julius Shaw's, Kevin Shaw's, Kurt Shaw's, and Owen Stern's pattern of racketeering activity consisted of the acts of mail and wire fraud (described in paragraphs 21-108 and 134-142, *supra*) and bank fraud (as described in paragraphs 21-108 and 143, *supra*).

151.    At all relevant times, the enterprises alleged in paragraphs 145 through 150 (*supra*) were engaged in, and their activities affected, interstate commerce and foreign commerce.

152.    All of the acts of racketeering described in paragraphs 21 through 108 and 134 through 143 (*supra*) were related so as to establish a pattern of racketeering activity,

within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud CBL franchisees of money or property, their common result was to defraud CBL franchisees of money and property; JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern, personally or through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

153.    All of the acts of racketeering described in paragraphs 21 through 108 and 134 through 143 (*supra*) are continuous so as to form a pattern of racketeering activity in that JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern have engaged in the predicate acts over a substantial period of time or in that JoAnne Shaw's, Julius Shaw's, Kevin Shaw's, Kurt Shaw's, and Owen Stern's acts of racketeering are a regular way in which JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern continue to do business and their acts of racketeering threatened to continue indefinitely.

154.    As a direct and proximate result of, and by reason of, the activities of JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, Plaintiffs suffered damages to the extent that JoAnne Shaw, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern fraudulently induced Plaintiffs to invest in a CBL franchise, defrauded Plaintiffs of money or property, caused Plaintiffs to incur debt to finance the acquisition, build-out and operation of their store, fraudulently induced Plaintiffs to purchase supplies and equipment at inflated prices, caused Plaintiffs to encumber property to secure debt to finance the acquisition,

build-out and operation of their store. Plaintiffs are, therefore, entitled to recover threefold

the damages they sustained together with the cost of the suit, including costs, reasonable

attorneys' fees and reasonable experts' fees.

**COUNT VI**
**18 U.S.C. § 1962(c)**
**(Against CBL)**

155.    Plaintiffs incorporate by reference Paragraphs 1 through 154 of the

Amended Complaint as if fully set forth herein.

156.    Since 2002 and continuing to the present (at a minimum), the following legal

entity constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c):

PSED.

(a)    CBL is a "person," within the meaning of 18 U.S.C. §§ 1961(3) &

1962(c), who individually associate with and/or participate in the conduct of

said enterprise's affairs through a pattern of racketeering activity.

(b)    Since 2002 and continuing to the present (at a minimum), CBL

conducted, participated in, engaged in, and operated and managed the

affairs of PSED through a pattern of racketeering activity within the

meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). CBL's pattern of

racketeering activity consists of the acts of mail and wire fraud (described in

paragraphs 21-108 and 134-142, *supra*) and bank fraud (as described in

paragraphs 21-108 and 143, *supra*).

157.    In the alternative to paragraph 156, from May 2003 through November 2007

(at a minimum), the following individuals (or any combination thereof) constituted an

"enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they were "a

group of individuals associated in fact": Richard Welshans and Deborah Williams (Welshans / Williams Enterprise).

(a)      CBL is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of said enterprise's affairs.

(b)      Members of the Welshans / Williams Enterprise shared the common purpose of (among other things) operating a CBL franchise. Members of the Welshans / Williams Enterprise were all related in that they were husband and wife. The Welshans / Williams enterprise also possessed sufficient longevity for the members to carry out their purpose(s) in that they financed, built-out and operated a CBL franchise from May 2003 through November 2007.

(c)      From May 2003 through November 2007, CBL conducted, participated in, engaged in, and operated and managed the affairs of the Welshans / Williams Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). CBL's pattern of racketeering activity consisted of the acts of mail and wire fraud (described in paragraphs 21-107 and 132-140, *supra*) and bank fraud (as described in paragraphs 21-107 and 141, *supra*).

158.    In the alternative to paragraphs 155 and 157, from August 2003 through November 2007 (at a minimum), the following legal entity constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c): WW.

(a)      CBL is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of said enterprise's affairs.

(b)      From August 2003 through November 2007, CBL conducted, participated in, engaged in, and operated and managed the affairs of the WW through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). CBL's pattern of racketeering activity consisted of the acts of mail and wire fraud (described in paragraphs 21-108 and 134-142, *supra*) and bank fraud (as described in paragraphs 21-108 and 143, *supra*).

159.   In the alternative to paragraphs 156 through 158, since 2000 and continuing to the present (at a minimum), the following companies and individuals (or any combination thereof) constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they were "a group of individuals associated in fact":  CBL approved suppliers to CBL franchises, including (but not limited to):  Pepsico, Norpac, and Solo Cup ("Supplier Enterprise").

(a)      CBL is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually associated with and/or participated in the conduct of said enterprise's affairs.

(b)      Members of the Supplier Enterprise shared the common purpose of (among other things) defrauding CBL franchisees of money and property for the benefit of CBL.  Members of the Supplier Enterprise were all related in that they were / are suppliers of CBL franchisees.  The Supplier enterprise

also possesses sufficient longevity for the members to carry out their purpose(s) in that they have provided supplies to CBL franchises since 2000 (at a minimum).

(c)     Since 2000 continuing through the present, CBL conducted, participated in, engaged in, and operated and managed the affairs of the Supplier Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). CBL's pattern of racketeering activity consists of the acts of mail and wire fraud (described in paragraphs 21-108 and 134-142, *supra*) and bank fraud (as described in paragraphs 21-108 and 143, *supra*).

160.    At all relevant times, the enterprises alleged in paragraphs 154 through 156 (*supra*) were engaged in, and their activities affected, interstate commerce and foreign commerce.

161.    All of the acts of racketeering described in paragraphs 21 through 108 and 134 through 143 (*supra*) were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud CBL franchisees of money or property, their common result was to defraud CBL franchisees of money and property; CBL, personally or through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

162.     All of the acts of racketeering described in paragraphs 21 through 108 and 134 through 143 (*supra*) are continuous so as to form a pattern of racketeering activity in that CBL has engaged in the predicate acts over a substantial period of time or in that CBL's acts of racketeering are a regular way in which CBL continues to do business and its acts of racketeering threatened to continue indefinitely.

163.     As a direct and proximate result of, and by reason of, the activities of CBL, and its conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, Plaintiffs suffered damages to the extent that CBL fraudulently induced Plaintiffs to invest in a CBL franchise, defrauded Plaintiff's of money or property, caused Plaintiffs to incur debt to finance the acquisition, build-out and operation of their store, fraudulently induced Plaintiffs to purchase supplies and equipment at inflated prices, caused Plaintiffs to encumber property to secure debt to finance the acquisition, build-out and operation of their store. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

### COUNT VII
### (RICO)
### 18 U.S.C. § 1962(d)
### (Conspiracy – Against Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern)

164.     Plaintiffs incorporate by reference Paragraphs 1 through 163 of the Amended Complaint as if fully set forth herein.

165.     Count VII is brought in the alternative to the claims pled against Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern in Count V.

166.     As set forth in Count V, JoAnne Shaw violated 18 U.S.C. § 1962(c).

167.    Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern conspired with JoAnne Shaw to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra* ¶¶ 145-149) through a pattern of racketeering activity (*see supra* ¶¶ 21 - 108 and 134 - 143) in violation of 18 U.S.C. § 1962(d).  In particular, Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern intended to further an endeavor of JoAnne Shaw which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

168.    Plaintiffs were injured by Julius Shaw's, Kevin Shaw's, Kurt Shaw's, and Owen Stern's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) acts of mail and wire fraud (described in paragraphs 21-108 and 134-142, *supra*) and bank fraud (as described in paragraphs 21-108 and 143, *supra*).

169.    As a direct and proximate result of, and by reason of, the activities of Julius Shaw, Kevin Shaw, Kurt Shaw, and Owen Stern, and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs suffered damages to the extent that CBL fraudulently induced Plaintiffs to invest in a CBL franchise, defrauded Plaintiffs of money or property, caused Plaintiffs to incur debt to finance the acquisition, build-out and operation of their store, fraudulently induced Plaintiffs to purchase supplies and equipment at inflated prices, caused Plaintiffs to encumber property to secure debt to finance the acquisition, build-out and operation of their store.  Plaintiffs are, therefore, entitled to recover threefold

the damages they sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

**COUNT VIII**
**(RICO)**
**18 U.S.C. § 1962(d)**
**(Conspiracy – Against JoAnne Shaw, Julius Shaw, Kurt Shaw, and Owen Stern)**

170.    Plaintiffs incorporate by reference Paragraphs 1 through 169 of the Amended Complaint as if fully set forth herein.

171.    Count VIII is brought in the alternative to the claims pled against JoAnne Shaw, Julius Shaw, Kurt Shaw, and Owen Stern in Count V.

172.    As set forth in Count V, Kevin Shaw violated 18 U.S.C. § 1962(c).

173.    JoAnne Shaw, Julius Shaw, Kurt Shaw, and Owen Stern conspired with Kevin Shaw to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra* ¶¶ 145-149) through a pattern of racketeering activity (*see supra* ¶¶ 21 - 108 and 134 - 143) in violation of 18 U.S.C. § 1962(d).  In particular, JoAnne Shaw, Julius Shaw, Kurt Shaw, and Owen Stern intended to further an endeavor of JoAnne Shaw which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

174.    Plaintiffs were injured by JoAnne Shaw's, Julius Shaw's, Kurt Shaw's, and Owen Stern's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) acts of mail and wire fraud (described in paragraphs 21-108 and 134-142, *supra*) and bank fraud (as described in paragraphs 21-108 and 143, *supra*).

175.    As a direct and proximate result of, and by reason of, the activities of JoAnne Shaw, Julius Shaw, Kurt Shaw, and Owen Stern, and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs suffered damages to the extent that CBL fraudulently induced Plaintiffs to invest in a CBL franchise, defrauded Plaintiff's of money or property, caused Plaintiffs to incur debt to finance the acquisition, build-out and operation of their store, fraudulently induced Plaintiffs to purchase supplies and equipment at inflated prices, caused Plaintiffs to encumber property to secure debt to finance the acquisition, build-out and operation of their store.  Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

WHEREFORE,  WW, Welshans and Williams demand judgment against the Shaws and CBL, jointly and severally, in the amount of Two Million Dollars ($2,000,000.00) in compensatory damages to be trebled to Six Million Dollars ($6,000,000.00), attorneys' fees in an amount to be determined, along with interest, costs, and such other relief as this Court determines is reasonable and appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

                            /s/
_____
Harry M. Rifkin, Fed. Bar No. 01333
Law Offices of Harry M. Rifkin LLC
300 Reisterstown Road
Suite 105
Baltimore, Maryland  21208

(410) 779-9199
(410) 710-6947

hrifkin@rifkinlaw.net

**Attorneys for Plaintiffs WW, LLC t/a The
Coffee Beanery Café, Deborah Williams
and Richard Welshans**

Of counsel:
Jeff Grell, Esquire
Grell & Feist LLC
825 Nicollet Mall, Suite 1648
Minneapolis, MN 55402
(952) 835-4101
Fax: 612-354-7230
jgrell@ricoact.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of January 2012, a copy of the

foregoing Second Amended Complaint was electronically filed, and electronically served

upon:

Stephan Y. Brennan, Fed. Bar No. 023597
Iliff, Meredith, Wildberger & Brennan, P.C.
Patriots Plaza, Suite 201-203
8055 Ritchie Highway
Pasadena, Maryland 21122
steve@ilimer.com

and to

William L. Killion
Faris A. Rashid
Faegre & Benson
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
WKillion@faegre.com

_____/s/_____
Harry M. Rifkin, Fed. Bar No. 01333